Filed 10/24/24  In re K.L. CA2/4

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(a). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115(a).

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re K.L. et al., Persons Coming Under the Juvenile Court Law. | B331307 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>      Plaintiff and Respondent,<br><br>      v.<br><br>M.L.<br><br>      Defendant and Appellant. | Los Angeles County Super. Ct. No. 21CCJP02750 |

APPEAL from an order of the Superior Court of Los Angeles County, Brett Bianco, Judge. Reversed in part and affirmed in part.

Paul Couenhoven, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, Navid Nakhjavani, Deputy County Counsel, for Plaintiff and Respondent.

# INTRODUCTION AND BACKGROUND[1]

M.L. (mother) appeals from the juvenile court's orders asserting dependency jurisdiction over her three children, 15-year-old K.L., 9-year-old E.L., and 7-year-old A.L. The Department of Children and Family Services (Department) filed a Welfare and Institutions Code[2] section 300 petition on the children's behalf after police found the family home in an unsanitary and hazardous condition. Relevant to this appeal, the juvenile court sustained the petition and declared the children dependents of the court under section 300, subdivision (b). In exercising jurisdiction over the children, the court found true the allegations that the children were at substantial risk of serious physical harm due to: (1) mother establishing a filthy, unsanitary, and hazardous home (count b-1); and (2) mother's mental and emotional condition (count b-2).

On appeal, mother challenges the jurisdictional findings that the children were at risk due to her unsanitary home and mental illness. She contends the findings are unsupported by substantial evidence. For the reasons discussed below, we reverse

---

1     We resolve this case by memorandum opinion. (Cal. Stds. Jud. Admin., § 8.1.) The parties are familiar with the facts and procedural history of the case, so we do not fully restate those details here. (*People v. Garcia* (2002) 97 Cal.App.4th 847, 851 [unpublished opinion merely reviewing correctness of juvenile court's decision "does not merit extensive factual or legal statement" (fn. omitted)].) Instead, in the Discussion below, we discuss the facts and procedural background as needed to provide context for and resolve the issues presented in this appeal.

2     All undesignated statutory references are to the Welfare and Institutions Code.

the finding pertaining to count b-1, but affirm the finding arising under count b-2.

## DISCUSSION

### I.    Justiciability

Preliminarily, we address the Department's argument that mother's appeal should be dismissed as moot. Mother acknowledges her appeal is moot because, while this appeal was pending, the juvenile court terminated jurisdiction over the children and awarded her sole physical and legal custody. Mother requests we nevertheless exercise our discretion to consider her appeal on its merits as her status as an "offending" parent could have consequences in future proceedings concerning her custody of the children.

"An order terminating juvenile court jurisdiction generally renders an appeal from an earlier order moot." (*In re Rashad D.* (2021) 63 Cal.App.5th 156, 163.) "However, dismissal of a dependency appeal for mootness following termination of jurisdiction 'is not automatic, but "must be decided on a case-by-case basis."'" (*Ibid*.) "A case becomes moot when events "'render[ ] it impossible for [a] court, if it should decide the case in favor of plaintiff, to grant him [or her] any effect[ive] relief."' [Citation.] For relief to be 'effective,' two requirements must be met. First, the plaintiff must complain of an ongoing harm. Second, the harm must be redressable or capable of being rectified by the outcome the plaintiff seeks." (*In re D.P.* (2023) 14 Cal.5th 266, 276 (*D.P.*).) Thus, to avoid a finding of mootness, the appealing parent must "demonstrate[ ] a specific legal or practical consequence that would be avoided upon reversal of the [challenged] jurisdictional findings." (*Id.* at p. 273.)

3

In dependency cases, our Supreme Court has set forth several factors that may be considered in deciding whether to review jurisdictional findings in an otherwise moot appeal. (*D.P.*, *supra*, 14 Cal.5th at pp. 283, 285–286.) These factors include whether the finding "'could be prejudicial to the appellant or could potentially impact the current or future dependency proceedings [citations]; or . . . "could have other consequences for [the appellant], beyond jurisdiction."'" (*Id.* at p. 283; see also *In re J.K.* (2009) 174 Cal.App.4th 1426, 1431–1432 [holding the Court of Appeal has discretion to consider an appeal of jurisdictional findings where they could impact future proceedings].) Other factors include whether the jurisdictional finding is based on particularly pernicious or stigmatizing conduct and the reason why the appeal became moot. (*D.P., supra*, 14 Cal.5th at pp. 285–286.) "The factors above are not exhaustive, and no single factor is necessarily dispositive of whether a court should exercise discretionary review of a moot appeal." (*Id.* at p. 286.)

Having considered the *D.P.* factors, we conclude discretionary review is appropriate in this case. Specifically, we find the jurisdictional findings against mother may play a role in future dependency and/or family law proceedings, such that "ensuring the validity of [the challenged] findings . . . [is] particularly important." (*D.P., supra*, 15 Cal.4th at p. 285.) The allegations in this current case are similar to prior allegations against mother. Specifically, in 2005 the juvenile court sustained a section 300 petition on behalf of the children's older sibling due to filthy and unsanitary home conditions. In 2021, the juvenile court sustained another section 300 petition after mother's home was again "found to be in a filthy and unsanitary condition." At that time, the home had a roach infestation, droppings, and

4

gnats. Bottles, cans, clothes, toys, trash, and clutter filled the bedroom. A bucket of urine was in the bedroom and dirty dishes and old food were in the kitchen. Mother claimed the children's father, who had no contact with the family, was putting trash in the apartment while the family was sleeping or not home.

In addition, the parties do not dispute that jurisdiction was terminated based on mother's prompt compliance with her court-ordered case plan; therefore, "discretionary review [is] especially appropriate" in this case. (*D.P., supra*, 15 Cal.4th at p. 286.) Accordingly, we will exercise our discretion to reach the merits of her appeal of the jurisdictional findings.

## II. Mother's Jurisdictional Challenges

### A. Governing Principles and Standard of Review

Under section 300, subdivision (b)(1), the juvenile court has jurisdiction over a child where there is a substantial risk the child will be harmed by certain enumerated conduct of a parent or guardian. This conduct includes "[t]he failure or inability of the child's parent or guardian to adequately supervise or protect the child" and "[t]he inability of the parent or guardian to provide regular care for the child due to the parent's or guardian's mental illness, developmental disability, or substance abuse." (§ 300, subd. (b)(1)(A), (D).) "A jurisdictional finding under section 300, subdivision (b)(1), requires [the Department] to demonstrate the following three elements by a preponderance of the evidence: (1) neglectful conduct, failure, or inability by the parent; (2) causation; and (3) serious physical harm or illness or a substantial risk of serious physical harm or illness." (*In re L.W.* (2019) 32 Cal.App.5th 840, 848.)

"Although section 300 generally requires proof the child is subject to the defined risk of harm at the time of the jurisdiction hearing [citations], the court need not wait until a child is seriously abused or injured to assume jurisdiction and take steps necessary to protect the child [citation]. The court may consider past events in deciding whether a child currently needs the court's protection. [Citation.] A parent's '"[p]ast conduct may be probative of current conditions" if there is reason to believe that the conduct will continue.'" (*In re Kadence P.* (2015) 241 Cal.App.4th 1376, 1383–1384 overruled on other grounds in *In re N.R.* (2023) 15 Cal.5th 520, 560, fn. 18; see *In re T.V.* (2013) 217 Cal.App.4th 126, 133 ["[t]he focus of section 300 is on averting harm to the child"].) To establish a risk of harm at the time of the adjudication hearing, "[t]here must be some reason beyond mere speculation to believe the alleged conduct will recur." (*In re James R.* (2009) 176 Cal.App.4th 129, 136, abrogated on other grounds by *In re R.T.* (2017) 3 Cal.5th 622, 628.)

We review jurisdictional findings for substantial evidence. (*In re Yolanda L.* (2017) 7 Cal.App.5th 987, 992.) "Substantial evidence must be of ponderable legal significance. It is not synonymous with 'any' evidence. [Citation.] The evidence must be reasonable in nature, credible, and of solid value." (*In re Dakota H.* (2005) 132 Cal.App.4th 212, 228.) "[W]e view the record in the light most favorable to the juvenile court's determinations, drawing all reasonable inferences from the evidence to support the juvenile court's findings and orders." (*In re Yolanda L.*, *supra*, 7 Cal.App.5th at p. 992.) The test is whether it was reasonable for the trier of fact to make the ruling in question in light of the whole record. (*Ibid.*)

6

"We do not reweigh the evidence, evaluate the credibility of witnesses, or resolve evidentiary conflicts." (*In re Dakota H.*, *supra*, 132 Cal.App.4th at p. 228.) "The appellant has the burden of showing there is no evidence of a sufficiently substantial nature to support the finding or order." (*Ibid.*)

**B. Analysis**

### 1. Unsanitary Home

With respect to count b-1, mother contends the record lacks substantial evidence demonstrating that, at the time of the adjudication hearing on May 31, 2023, the children were at substantial risk of serious physical harm due to their unsanitary home. In support of her assertion, mother argues that by the time of the jurisdictional hearing, the home had been "fixed up," the living room and bedroom had new paint, the bathroom had been cleaned, the plumbing worked, the apartment manager said everything was in working order, a city inspector had closed the case involving the home, and a Department social worker said the home was "'habitable and sanitary.'" We agree with her contentions.

The family originally came to the Department's attention after neighbors called the police because, due to the smell, they believed there was a dead person inside the family's apartment. When mother opened the door for police, an overwhelming smell of mildew and a horrible stench emanated from the apartment. When mother opened the door further, police observed animal feces, human feces, and urine on the floor and in buckets throughout the living and dining room. They also observed roaches, gnats, and other insects covering the walls, swarming over decomposed food on the table, and on the floor. Black mold

covered the ceiling and window frames. The living room carpet appeared soiled with feces and piled with dirty clothes. The kitchen sink was piled with dishes, and the kitchen floor was piled with spoiled food.

Police entered the bedroom and observed broken bunk beds with mattresses on the floor piled under dirty clothes, dishes, and old food. Insects covered the ceiling and swarmed the air. Black mold covered the bedroom window frame. One of the mattresses had feces pellets resembling those of a rodent on it. The bedroom carpet was covered in what appeared to be dirt and feces. Police found the bathroom was inoperable. The bathtub was covered in dirt and orange grime. The sink was blocked with sludgy water. The toilet was clogged with piled feces, and toilet paper fell onto the floor. There was no food, blankets, or clean clothing in the home. Based on the condition of the home, police officers called housing authorities and the Department.

When a Department social worker entered the apartment later that day, they observed the same conditions as the police did along with additional issues. Many flies and roaches emerged when the social worker opened the non-operable refrigerator. The kitchen sink was clogged and full of dirty water with a strong smell of decay. The shower was not working. Based on the home's condition, the Department detained the children from mother.

On May 5, 2023, the Department met mother in her home and observed the bedroom had new paint and the bathroom was cleaned. By May 18, 2023, the city had inspected the apartment. Because there were no longer any violations and the home was clean, the inspector closed the case. The apartment manager reported the pipes had been repaired on May 15, 2023, and "about 90 percent progress" had been made by May 23, 2023. By

May 30, 2023, the manager reported everything in the apartment had been repaired. He had changed the light bulbs, put primer on the kitchen walls, and provided mother with a new working stove. According to the manager, everything was in order except the carpet needed to be cleaned again. On May 30, 2023, the Department reported the home appeared habitable and sanitary.

As indicated above, in the time between the detention hearing on April 19, 2023, and the adjudication hearing on May 31, 2023, mother resolved the issue of the unsanitary home. Accordingly, we conclude the record lacks substantial evidence to support a finding that, *at the time of the adjudication hearing*, the children were at substantial risk of serious physical harm due to mother's unsanitary home. Thus, the juvenile court's jurisdictional finding based on count b-1 must be reversed. [3]

### C. Mental Health

With respect to count b-2, mother contends the record lacks substantial evidence demonstrating that, at the time of the adjudication hearing, the children were at substantial risk of serious physical harm due to her mental illness. In support of her assertion, mother alleges the children had not suffered any harm nor were they at risk of suffering harm due to her mental illness. Moreover, while not entirely clear, mother seems to contend she

---

3    No doubt the juvenile court understandably was concerned that, due to her unresolved mental illness, mother would allow the home to revert to its prior unsanitary condition. In our view, that legitimate concern of risk of future harm relates more closely to count b-2 than b-1. Because we agree mother's home no longer posed a current risk of harm at the time of the adjudication hearing, we do not address her argument that the condition of the home did not cause the children to suffer any harm.

resolved her mental health issues after her discharge from her section 5150[4] hold and by the time of the jurisdictional hearing. For the reasons discussed below, we are not persuaded by her argument.

When police arrived at the apartment, mother had a "'glazed over' blank expression," "looked off into the distance when speaking," and "did not make direct eye contact." Mother's responses "were very scattered, inconsistent[,] and irrational." Mother reported her ex-husband, the children's father, would sneak into the apartment when no one was home and throw garbage and dirt inside. Mother, however, admitted father neither lived with nor had any contact with the family. Based on her demeanor and responses, police believed mother was suffering from an undiagnosed mental illness and took her to the hospital for a psychiatric evaluation. At the hospital, doctors placed mother on a section 5150 hold.

When a social worker interviewed mother at the hospital, mother was crying, did not make eye contact, and seemed distant. Mother alleged the condition of the home was not her fault. Even though she tried to keep the home clean and organized, she could not because father wanted "to take revenge on her." Mother had no contact with father since August 2022 but, she asserted, he would look for a way to enter the home

---

4      Under section 5150, certain officials (including law enforcement and certain medical professionals) are authorized to bring an individual to a designated mental health facility for evaluation if there is "probable cause to believe that the person is, as a result of a mental disorder, a danger to others, or to themselves, or gravely disabled." (§ 5150, subd. (e).) The individual may be placed into custody "for a period of up to 72 hours" for evaluation. (*Id.*, subd. (a).)

when no one was home. She claimed father would bring garbage and dirt into the home, leave the home full of trash and bags of clothing, and clog the toilet and the kitchen sink. She also claimed he "left a black cross with salt in the house, so nothing good will happen" to her or the children.

When interviewed by the Department in early May, mother claimed she "came back fine" from her section 5150 hospital stay. She was taking the 10 pills the hospital gave her for stress, and she felt "fine." Mother denied having a mental health diagnosis and reported she was told: "it was just stress." Mother denied ever having a mental health diagnosis in the past or being prescribed medication in the past. She explained that during her hospitalization she was told she could attend therapy if she wanted to, but that she did not need it.

When mother was discharged from the hospital, she was advised to follow up with urgent care as needed and was prescribed medication. She also had a follow-up appointment with San Fernando Valley Community Mental Health (San Fernando Community) on April 27, 2023. The San Fernando Community records indicate mother was assigned a case manager but never returned for services. When the Department called mother to follow up regarding her missed April appointment, mother did not respond. A follow-up text from the Department showed mother "read" the messages, but never responded.

K.L. excused the living situation and claimed the apartment had been dirty for only a few days. She reported "nothing [was] wrong with her house" and she and mother cleaned the home frequently. Because the bathroom did not work, all three children used a bucket to relieve themselves. When the

bucket was full, mother or K.L. emptied it into the trash outside the apartment. The children reported they used a neighbor's home to bathe. K.L. and E.L. both had a strong unpleasant odor during their initial contact with the Department. The children all reported father brought garbage and dirt into the home, but none of them had seen him do so.

The apartment manager believed mother did "not have the capacity to take care of" the children because of her mental health issues. Mother did not listen when having conversations and would start "'ta[l]king about something else." Mother was "not really there" mentally and would not "let herself be seen." She would "go[ ] another way'" when she would see the apartment manager. Additionally, mother had never reported the plumbing issues.

Both father and a maternal uncle were concerned about mother's mental health issues. Similarly, a neighbor told the Department she hoped mother got therapy because if not the children would be better off in another home. The neighbor also reported she never saw the cross mother told her father had made in the apartment.

Leading up to the adjudication hearing, mother did not show any insight into how her mental health issues may have placed the children at risk of harm. Instead, mother denied mental health issues and failed to report to her follow-up appointment. Mother continued to believe the delusion that the home was unsanitary because of father and convinced her children to believe the same. Mother also failed to realize the harm the unsanitary home caused the children. Not only were the children living among feces and bug infestations, but they also had no place to bathe, no clean bedding, and no clean

clothing. Additionally, the children were forced to use buckets as a toilet.

Based on mother's minimization of her mental health issues and her unawareness of the risks it posed to the children, the juvenile court could reasonably infer mother's mental health issues would continue to cause her to create an unsanitary and hazardous home. Therefore, the record contains substantial evidence to support a finding that, at the time of the adjudication hearing, mother's mental health issues placed the children at serious risk of physical harm.

## DISPOSITION

The jurisdictional finding based on count b-1 is reversed. The jurisdictional finding predicated on count b-2 is affirmed.

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

CURREY, P. J.

We concur:

COLLINS, J.

ZUKIN, J.

13